A07A1228. IN THE INTEREST OF K. A. B. et al., children.

(646 SE2d 736)

PHIPPS, Judge.

The biological mother of K. A. B. and W. R. B. appeals a juvenile court order terminating her parental rights in the children.[1] In her sole claim of error, she challenges the sufficiency of the evidence supporting termination. For reasons that follow, we affirm.

On appeal from an order terminating parental rights, we construe the evidence in a light most favorable to the juvenile court's ruling.[2] We do not weigh the evidence or resolve credibility issues, but merely determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated.[3]

So viewed, the evidence shows that in April 2003, the juvenile court entered a protective order for four-year-old K. A. B. and eight-year-old W. R. B. after police discovered drug paraphernalia in the family home and W. R. B. disclosed to authorities that she had seen her mother using narcotics. Although the juvenile court found the children to be deprived, it left them in their mother's custody pursuant to certain requirements, including that the mother undergo a substance abuse assessment, submit to drug testing, and take part in mental health counseling.

In a subsequent order filed in January 2004, the juvenile court determined that the mother had not submitted to required drug screens, taken part in the substance abuse assessment, maintained contact with the Department of Family and Children Services ("DFCS"), or complied with several other court directives. It again allowed the children to remain in the mother's custody subject to further requirements.

Later that year, however, the juvenile court removed the children from the home and placed them in DFCS custody. In a November 2004 deprivation order, the juvenile court found the children to be deprived and without proper parental care or control, given the mother's continued substance abuse and the children's numerous absences from school. The juvenile court continued DFCS's custody over the children in December 2005. The court's order noted that the mother had pleaded guilty to federal mail fraud charges and was on probation, which required her to submit to random drug tests and to complete six months of drug and alcohol classes. The juvenile court further found that the children were deprived, that the mother's

---

[1] The children's father is deceased.

[2] See *In the Interest of M. R.*, 282 Ga. App. 91 (637 SE2d 743) (2006).

[3] Id.

incarceration had prevented her from regularly visiting the children, and that she had not demonstrated compliance with the court-ordered reunification goals.

On April 25, 2006, DFCS petitioned to terminate the mother's parental rights in the children, and the juvenile court held a termination hearing beginning in June 2006. The evidence shows that, at the time of the hearing, K. A. B. and W. R. B. had lived with their maternal grandparents for over one year. During that period, W. R. B. had little contact with her mother, and K. A. B. visited with her mother four or five times, after which she sometimes "acted out." The mother periodically gave the children gifts and clothing, but she had provided no child support since the children entered DFCS custody in 2004.

W. R. B. testified that she had a "bad" relationship with her mother, who was often under the influence of drugs and had numerous men "in and out of the house." W. R. B. admittedly wanted someday to be closer to her mother. She asserted, however, that she wished to live with her grandparents.

The children's grandmother testified that she wanted to adopt the children. Although her husband had been diagnosed with cancer, they were able to take care of the children, and she asserted that she could care for them alone if he died. She further testified that she had a good relationship with the children, who were doing well in school. The children's grandfather similarly testified that he and his wife could take care of the children.

Shortly before the hearing, the mother told a DFCS worker that she was participating in drug and alcohol treatment. She also reported that neither she nor her husband were employed, that someone outside the home supported them, and that they were not ready to regain custody of the children.[4] She further stated that she was "going to be working on [her] GED," and she assured the DFCS worker that she was staying away from negative influences. The DFCS worker testified that he had not received any reports of a positive drug screen from the mother. The state offered testimony, however, that the mother had used methamphetamine in January 2006.

Clinical psychologist James Martin, who had treated W. R. B. for approximately one year and K. A. B. for approximately four months, also testified. W. R. B. was referred to him with adjustment issues, difficulties with "acting out behaviors," and possible post-traumatic

---

[4] At the time of the termination hearing, the mother had been married to her husband for almost three years.

stress issues. The treatment for K. A. B. involved minor adjustment issues and possible educational concerns relating to a prior head injury.

According to Dr. Martin, W. R. B. had unresolved issues of anger toward her mother at the time of the hearing, including a belief that she was less important to her mother than drugs and men. Dr. Martin asserted that W. R. B. had bonded closely with her grandparents, wished to maintain that bond, and did not want to return to her mother's home. He further testified that removing W. R. B. from her grandparents' custody would cause her psychological harm.

With respect to K. A. B., Dr. Martin testified that she was a happy, well-adjusted child who performed well in school and had close bonds with her sister and grandparents. Although K. A. B. made positive comments about her mother, she never initiated a request for visitation, and her positive comments were often superficial, indicating a superficial bond. Dr. Martin asserted that K. A. B. needed close, stable relationships, which she had with her grandparents. He further testified that removing K. A. B. from her grandparents' home would have a negative emotional impact on her.

Dr. Martin noted that, after speaking with the mother, he had significant concerns about the stability of her home situation, as well as her propensity to blame others for her problems. He concluded that termination of the mother's parental rights would be in the best interests of the children. The court-appointed guardian ad litem similarly recommended termination of the mother's rights and adoption by the grandparents.

The children's court-appointed special advocate ("CASA") testified that she had visited with the children at least once a month since her appointment in September 2004. According to the CASA, the children appeared happy and healthy in the placement with their grandparents, and she saw no indication that they wished to leave the placement. Although the children's grandfather had been ill, the children were cared for, and the grandfather was helping renovate his house to add a new bedroom and bathroom for W. R. B.

The mother offered evidence that, at the time of the hearing, her husband was employed and paid the rent on their home. She admittedly was not employed, but she testified that she had been working on her GED since April or May 2006, attending classes twice per week. The mother characterized her relationship and life with her husband as "stable," and she asserted that she was "doing really good" and "trying to better [herself] for [her] children."

The mother also testified that, pursuant to the requirements of her federal probation for mail fraud, she had completed a six-month

drug treatment program and had submitted to drug testing since November 2005. She denied using methamphetamine in January 2006.

Before terminating parental rights, a juvenile court must engage in a two-step analysis:

First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.[5]

After applying this two-prong test, the juvenile court terminated the mother's parental rights in K. A. B. and W. R. B. We find no error.

1. *Parental Misconduct or Inability.*

(a) *Deprivation / lack of parental care and control.* In prior orders, the juvenile court found the children to be deprived and determined that such deprivation resulted from a lack of proper parental care and control. The record contains no evidence that the mother appealed these findings and conclusions, which are thus binding and establish the first two factors in the termination proceeding.[6]

(b) *Cause of the deprivation is likely to continue.* The mother argues on appeal that the juvenile court erred in concluding that she had not remedied — and likely would not be able to remedy — the deprivation. She points to testimony that she had completed a drug treatment program, as well as the lack of evidence that she ever failed a drug test, to support her claim that she had remedied the deprivation.

As noted by the juvenile court, however, the record contains no evidence other than the mother's testimony that she successfully completed a drug treatment program, and her testimony provided scant details regarding the program.[7] Moreover, the state presented evidence that in January 2006 — while the mother allegedly was

---

[5] *In the Interest of M. R.*, supra at 99 (footnotes and punctuation omitted).

[6] *In the Interest of J. G.-S.*, 279 Ga. App. 102, 102-103 (1) (a), (b) (630 SE2d 615) (2006).

[7] At the hearing, the mother tendered into evidence a certificate she purportedly received following her completion of the program. The juvenile court refused to admit the document, finding it to be hearsay. The mother has not enumerated that evidentiary ruling as error on appeal.

taking part in the program — she used methamphetamine. And although Dr. Martin testified that the mother should regularly attend a support group such as Alcoholics Anonymous or Narcotics Anonymous, she admittedly had not done so, asserting that she instead "check[ed] in with a counselor from time to time" and talked with someone at the drug treatment center "whenever [she] [felt] the need to." Given the mother's history of drug use, the juvenile court was authorized to find that she had not remedied her substance abuse problem.

The evidence further supports the juvenile court's conclusion that the children's deprivation will likely continue. In addition to her substance abuse, the mother had several psychological issues for which she needed mental health treatment. But rather than seeking such treatment, she decided to use her substance abuse classes as a type of group therapy. With respect to stability, the evidence shows that the mother had no employment at the time of the hearing. Furthermore, she did not enroll in GED classes until around the time the state filed its termination petition, and despite her lack of employment, she attended classes only twice weekly. The state also offered evidence that the mother had never paid child support for the children, lacked a parental bond with W. R. B., and had only a superficial bond with K. A. B.

The mother asserted at the termination hearing that she was working to better herself and would take any steps necessary to regain custody of her children. Decisions regarding a child's future, however, " 'must rest on more than positive promises which are contrary to negative past fact.' "[8] And in determining whether deprivation is likely to continue, the juvenile court may consider the mother's past conduct.[9]

Although the mother's efforts to address her substance abuse and instability " 'are laudable, the juvenile court, not this court, determines whether a parent's conduct warrants hope of rehabilitation, and it also judges the credibility of [the mother's] good intentions.' "[10] The evidence presented, including the mother's history of substance abuse and mental health issues, her use of methamphetamine in early 2006, her failure to pay child support, her lack of a

---

[8] *In the Interest of M. R.*, supra at 99 (1) (footnote omitted).
[9] Id.
[10] Id. at 100 (footnote omitted).

significant parental bond with the children, and her unemployment, authorized the juvenile court to find that the cause of the deprivation is likely to continue.[11]

(c) *Harm from continued deprivation.* In determining the likely harm to a child, the juvenile court may take into account the same facts that demonstrate continued deprivation.[12] Additionally, the children's treating psychologist testified that neither child had a significant bond with the mother, the children needed the type of stability and support offered by their grandparents, and both would be impacted negatively if removed from their grandparents' home. The evidence thus supports the juvenile court's conclusion that continued deprivation is likely to cause the children serious physical, mental, emotional, or moral harm.[13]

2. *The Best Interests of the Children.* The juvenile court's finding of parental inability also supports its conclusion that termination is in the children's best interests.[14] Again, the mother had a history of drug abuse, mental health issues, and instability. In contrast, the children needed stability, and they thrived in the care of their grandparents. Although the children's grandfather was ill at the time of the termination hearing, the grandmother testified about her individual bond with the children, asserted that she could care for them alone if he died, and expressed a desire to adopt them.[15] The guardian ad litem recommended termination, and the children's treating psychologist testified that termination would benefit them. Accordingly, the juvenile court was authorized to conclude that termination would serve the children's best interests.[16]

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED MAY 24, 2007.

*Donna A. Seagraves*, for appellant.

---

[11] See id.; *In the Interest of C. J.*, 279 Ga. App. 213, 217 (1) (630 SE2d 836) (2006); *In the Interest of J. G.-S.*, supra at 103 (1) (c).

[12] *In the Interest of K. A. S.*, 279 Ga. App. 643, 651 (1) (d) (632 SE2d 433) (2006).

[13] See *In the Interest of D. A. B.*, 281 Ga. App. 702, 705 (1) (d) (637 SE2d 102) (2006); *In the Interest of K. A. S.*, supra at 651-652; *In the Interest of J. G.-S.*, supra at 103-104 (1) (d).

[14] See *In the Interest of K. A. S.*, supra at 652 (2).

[15] It appears that approximately one month after the trial court entered its termination order, the children's grandfather died.

[16] See *In the Interest of D. A. B.*, supra at 705 (2); *In the Interest of K. A. S.*, supra; *In the Interest of J. G.-S.*, supra at 104 (2).

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Jeffrey K. Williams*, for appellee.