628 S.E.2d 626 (2006)
278 Ga. App. 192
In the Interest of A.H. et al., children.
No. A05A2170.
Court of Appeals of Georgia.
March 13, 2006.
*628 James K. Anagnostakis, Douglasville, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, T. Michael Flinn, Carrollton, for appellee.
BARNES, Judge.
A juvenile court terminated the parental rights of the mother and putative fathers as to the children Z.H. and M.H.[1] The mother appeals the juvenile court's order contending that her failure to comply with the case plan was justifiable, the State did not show by clear and convincing evidence that the deprivation was likely to continue or cause harm, and that the Department of Family and Children Services had failed to pursue alternatives to the termination. We find no error and therefore affirm.
"On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost." (Footnote omitted.) In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001). A juvenile court's termination of parental rights is a two-step process:
The first step requires a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors are satisfied, the court must then determine whether termination of parental rights is in the child's best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.
(Footnotes omitted.) In the Interest of T.F., 250 Ga.App. 96, 98(1), 550 S.E.2d 473 (2001). See OCGA § 15-11-94(a), (b)(4)(A)(i)-(iv).
Viewed in the light most favorable to the juvenile court's judgment, the record shows that the Carroll County Department of Family and Children Services ("DFACS") first became involved with the children after receiving information that they were living in unfit conditions. It is not clear from the record when this investigation was initiated. The mother entered into a safety plan with DFACS. On September 12, 2003, during a home visit, DFACS discovered that the mother had been arrested for prescription drug fraud, and the children were living with M.H.'s paternal grandmother, an alleged methamphetamine dealer. DFACS filed a deprivation complaint, and the juvenile court subsequently entered a shelter care order for the children. Following a 72-hour hearing, the court found probable cause of deprivation because the parents "have subjected the children to illegal drug activity, violated the safety plan with the Department, were arrested..., and left the minor children in the care of a known drug addict and dealer," and granted DFACS temporary custody. DFACS filed a deprivation petition alleging that the children were in need of protection because they had been found living in unfit conditions "and the electricity in the home had just been reconnected," the mother signed a safety plan but did not comply with it, the mother was arrested, and the mother had allowed the children to live with a drug abuser and dealer. Following a hearing in October 2003, the court returned custody of the children to DFACS, but placed the mother under a protective order that required her *629 to submit to random drug screenings, obtain a psychological evaluation and counseling, stabilize her work and home situation, and obtain a valid identification card.
In December 2003, DFACS filed another deprivation complaint on behalf of the children after receiving a report that the mother had failed to comply with a drug treatment program, failed to comply with the conditions of the protective order, and had driven with the children in the car while under the influence of drugs. Another shelter care order was issued, and following the 72-hour hearing, the court once again found probable cause of deprivation and placed the children in the temporary custody of DFACS. At this hearing, the mother's caseworker testified that DFACS had received information from three separate sources regarding the mother's alleged drug usage, including a positive drug screen. The mother said that she was not stable enough at that time to care for her minor children. DFACS moved and the court ordered that the children be placed in the home of the maternal grandparents. At the January 15, 2004 deprivation hearing, a new case plan was incorporated into the order finding the children deprived that required the mother to complete parenting classes, obtain and maintain housing and income, complete parenting classes, complete a drug treatment program, follow treatment recommendations for physical and mental health care providers, and remain drug and alcohol free for six months. The court approved reunification as the permanency plan. The mother appealed from this deprivation order, but later withdrew it.
In February 2004, the mother was arrested and incarcerated for shoplifting, and in March DFACS prepared a new case plan with substantially the same goals as the earlier plan. A subsequent review panel noted that all of the goals were ongoing, and recommended continued placement in foster care with the maternal grandparents. After several continuances, the court conducted a review hearing in June 2004, after which it found that the mother was currently enrolled in yet another drug treatment facility, and had failed to make any progress on her reunification case plan goals. A Court Appointed Special Advocate report noted that the mother had been "in and out" of several drug rehabilitation facilities, and that the children had adapted well to foster placement and needed to remain in that placement until the mother resolved her drug addiction.
A new case plan recommending nonreunification and adoption was submitted in which it was noted that the mother had no visitations with her children in part because of her conduct around them, as well as her drug use. In February 2004, the mother had returned the children three hours late after a visit and appeared erratic and intoxicated. On another visit she was so intoxicated that she could not speak clearly and was barely conscious.
In October 2004, when DFACS filed a petition to terminate the mother's parental rights, the mother was served by publication because her whereabouts were unknown. In January 2005, the court conducted a hearing on the petition, and after hearing testimony from the mother, several caseworkers, and the foster parents, terminated the mother's parental rights. She now appeals.
1. The mother contends that the trial court erred in terminating her parental rights because her failure to comply with her case plan was justifiable, contending that she did not get a copy of her case plan and that DFACS failed to assist her in getting help with her mental health and drug problems.
The mother argues that she could not work toward achieving the goals because she was not aware of them because DFACS never gave her a copy. We find no validity to this argument. Although the caseworkers could not remember if they mailed a copy of the case plan to the mother, extensive testimony was presented from the caseworkers regarding their efforts to get the mother to come in to sign and discuss the plan and her lack of cooperation in maintaining contact with DFACS. Moreover, it was evident from the mother's testimony at the termination hearing that she was familiar with the case plans and its requirements. The mother cannot refuse to cooperate with DFACS and then claim that she could not work toward the case plan because she was not apprised of it.
*630 Moreover, although the mother complains that DFACS did not provide support for her in achieving help for her mental health and drug abuse issues, DFACS is not legally obligated to provide assistance in meeting these goals. In the Interest of S.J.C., 234 Ga.App. 491, 494(2), 507 S.E.2d 226 (1998). However, contrary to her contention, the evidence shows that such assistance was provided here.
2. The mother asserts the trial court erred in concluding that any such deprivation would likely continue or not be remedied. We do not agree. We first note that in addition to evidence of present parental misconduct or inability, evidence of past conduct may properly be considered in determining whether the deprivation would be likely to continue if the children returned to her mother. In the Interest of D.N.B., 258 Ga.App. 481, 485(2), 574 S.E.2d 574 (2002). Repeated failure to comply with case plan goals may also show that the cause of the deprivation is likely to continue. In the Interest of M.C.L., 251 Ga.App. 132, 135(1)(a), 553 S.E.2d 647 (2001).
Here, the juvenile court looked at the lack of the mother's compliance with her case plan goals. It was obvious that, despite the efforts of DFACS to assist the mother in reuniting with the children, the mother had made little progress and had failed to comply with her case plan goals. The mother has yet to establish a stable home for herself and the children. In fact, during much of the past two years, DFACS had no idea how to contact her. Oftentimes, she was not living at the addresses she provided to caseworkers, or had only stayed there for a brief period. At the time of the hearing, she had lived at her current address for only four months. The mother also had not obtained and maintained stable employment, and even though she testified that she was employed at the time of the termination hearing, she had worked with her mother for a period of only two months, and was currently incarcerated. The evidence also showed that she had been in four different drug treatment facilities during the past year and did not complete any of the programs, and had been incarcerated three times in the past year.
Despite recent efforts made by the mother to comply with some of her case plan goals, the juvenile court was entitled to place more weight on "negative past facts" than "positive promises" or projections as to the future, and to find that, in view of the mother's past conduct, the deprivation was likely to continue. In the Interest of R.A.R., 259 Ga.App. 680, 686(2), 577 S.E.2d 872 (2003). In considering recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation. In the Interest of A.M.L., 242 Ga.App. 121, 124(1)(c), 527 S.E.2d 614 (2000). Based on this evidence, the juvenile court was authorized to find that the mother's parental unfitness is continuing and is unlikely to be remedied.
3. The mother contends the trial court erred in concluding that any such deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. The same circumstances that supported the juvenile court's conclusion that the children are deprived due to a lack of proper parental care or control and that such deprivation is likely to continue also provides clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause the children serious physical, mental, emotional, or moral harm. See In the Interest of M.J.T., 255 Ga.App. 553, 556, 565 S.E.2d 877 (2002). The juvenile court is not obligated to return a child to a parent and wait for the child to actually be harmed before terminating the parent's rights to the child. In the Interest of V.M.T., 243 Ga.App. 732, 736(3), 534 S.E.2d 452 (2000).
Here, the facts clearly demonstrate that the mother failed to complete the DFACS's reunification plan and failed to obtain stable housing or employment, failed to complete drug treatment, failed to visit regularly with the children, had repeated incarcerations, and failed to support the children. It is well established that the mother is required under Georgia law to provide for her child, financially and otherwise, with or without a court order expressly directing her to do so. OCGA §§ 19-7-2; 15-11-94(b)(4)(C)(ii).
*631 Moreover, the evidence showed that when M.H. was first placed in foster care, she was grossly overweight such that she could not roll over or hold her head up, and Z.H. had a speech impediment that required corrective surgery. The children also received counseling for separation anxiety. The juvenile court was authorized to conclude that these needs would not be met by the mother.
In addition, the juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems. In the Interest of M.C.L., supra, 251 Ga.App. at 136(1)(b), 553 S.E.2d 647. Accordingly, the juvenile court properly found that the children's continued deprivation would likely cause them serious physical, mental, emotional or moral harm.
4. The mother contends DFACS failed to pursue alternatives to termination as required by established law. OCGA § 15-11-103(a)(1) provides that where parental rights are terminated, and there is no parent having parental rights, the court shall first attempt to place the child with a relative.
The evidence shows that the children were placed with foster parents who were also the maternal grandfather and stepgrandmother, and who plan to adopt the children. There being some evidence that the Department complied with OCGA § 15-11-103(a)(1), the mother has not shown a basis for reversal for failure to conduct a search for a suitable relative with whom to place the child. See In the Interest of G.B., 263 Ga.App. 577, 584(2), 588 S.E.2d 779 (2003).
5. The court noted that a troubling aspect of this case is the possible contact the mother could have with the children because the adopting persons are the maternal grandparents. It conceded that "the matter could be held as non-reunification and there could be a long-term temporary custody placed with the foster parents which could be reviewed, as noted every three years." It concluded, however, and we agree, that
the children should not have to be in a state of instability to try to determine every three years whether their situation is going to be changed.... The children need to know who their father and mother are even though they may be adoptive. They need to know stability and that a caring person is there with them every day and will continue to be with them and not have the false hope, which has been indicated in the past, that their mother, at some time in the future, will decide to change and solve her life's problems.
Judgment affirmed.
RUFFIN, C.J., and JOHNSON, P.J., concur.
NOTES
[1] The notice of appeal was erroneously styled to include A.H., who is not the Appellant's child. The termination order only applied to the mother's two children, Z.H. and M.H.